**William M. OETTMEIER, Jr., Personal Representative of the Estate of Russell L. Carter, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 87–49–VAL(WDO).**

United States District Court,
M.D. Georgia,
Valdosta Division.

March 16, 1989.

---

Michael D. Jones, Charleston, S.C., for plaintiff.

Jack Hood, Asst. U.S. Atty., Macon, Ga., Michael J. King, Washington, D.C., for defendant.

OWENS, Chief Judge:

In this non-jury civil action the Estate of Russell L. Carter sues for a refund of $229,063.35 estate taxes paid under protest on 3,309.46 acres of leased timberland owned by the deceased and situated in Echols County, Georgia and Columbia County, Florida. Taxpayer contends the estate's expert's fair market value [1] of $1,075,574.50 should be found by this court to be the fair market value on February 10, 1981, the date of Mr. Carter's death, and the Internal Revenue Service contends to the contrary.

The court's task is to determine factually "the amount at which [this] property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts...." Black's Law Dictionary, 5th Ed. p. 537; see also Treas. Reg. Section 20.2031–1(b).

### The Relevant Undisputed Facts

Russell L. Carter died February 10, 1981, owning 3,309.46 acres of timberland situated on the Georgia/Florida border and subject to a sixty-six-year timber lease dated January 20, 1956, between Mr. Carter and Owens–Illinois, Inc.,[2] as supplemented by agreements dated September 1, 1977, and June 6, 1980.

Under the timber lease as supplemented:

(a) Owens–Illinois, Inc. received complete and exclusive use and control of the subject property, with the exception that Russell L. Carter retained the personal right to hunt and fish on the land.

---

1. The fair market value of this property on the estate tax return was $129,665.31; taxpayer's expert did not even attempt to justify that value. Taxpayer, in proposed findings, sticks with the returned value. Since taxpayer's expert suggests a higher value, the court perceives the taxpayer's real contention to be that its expert's opinion should be accepted.

2. Owens–Illinois, Inc. subsequently assigned its interest to Nekoosa. For valuation purposes that is immaterial since neither party contends that lessens the lessor's expectation of future performance.

(b) During the term of the lease, Owens–Illinois is obligated to purchase from Russell L. Carter one cord of wood for each acre of land and to pay Russell L. Carter on January 20 of each year, a minimum payment of $2.69 per cord of timber harvested, subject, however, to upward or downward adjustments in this amount based upon increases or decreases in the Producer Price Index (previously known as the Wholesale Price Index for all commodities). Even if the land does not produce one cord of wood per acre per year, Owens–Illinois is still obligated to pay for one cord per acre per year. Owens–Illinois pays all ad valorem taxes.

(c) Required upward adjustments resulted in the 1981 payment being made at the rate of $9.12 per acre. That January 20 payment totalling $30,182.00 had been received by Mr. Carter before he died.

(d) Forty annual payments (1982 plus 39 more) remained to be paid as of Mr. Carter's death.

(e) On the expiration of the term of the contract, the subject property will revert to Russell C. Carter's heirs or assigns.

(f) Owens–Illinois is obligated during the last five years of the contract not to cut and remove timber to such an extent as will reduce the standing and growing merchantable timber to less than fifty percent (50%) of the merchantable timber which was on the lands at the inception of the lease. Nevertheless, the contract provides:

[I]n the event of damage to timber by fire, windstorm or other casualty, [Owens–Illinois] may cut and remove such damaged timber, notwithstanding that the quantity of standing and growing timber upon said lands may thereby be reduced below the aforesaid permitted percentage of timber now upon said lands. In the event that at any time during the last five (5) years of the term of this contract the quantity of merchantable timber shall become, from any cause whatsoever, less than fifty (50%) per cent of the quantity of such timber now on said lands (to be computed as hereinabove provided), [Owens–Illinois] shall thereupon cease cutting and removing

said timber from said lands, except and only to the extent required by good forestry practices, until there shall be standing and growing upon said lands in excess of fifty (50%) per cent of the quantity of such merchantable timber now thereon. The quantity of merchantable timber which may be cut and removed pursuant to the aforesaid provisions shall be decreased or increased in the event the area of the lands subject to this contract shall be decreased or increased.

(g) If the owner desires to sell the timberland, he must first offer it to Owens–Illinois at the price and upon the terms he is willing to sell to others; Owens–Illinois has three months within which to buy at the offered price and terms.

The heirs of Russell L. Carter have not attempted to sell this property and this lease and indicate they presently have no intention of doing so.

### Findings of Fact

Taxpayer and the government acknowledge there is no particular formula or approach that is generally used by willing buyers and sellers or that the court as fact-finder must use in arriving at the fair market value of this leased timberland. They further acknowledge that like a jury, the court may arrive at fair market value using any approach satisfactory to the court, including but not limited to the principal ingredient that all jurors and judges use in finding facts—COMMON SENSE!

Taxpayer's counsel relies upon *Saunders v. United States*, 48 AFTR 81–6279, in which the taxpayer and the government stipulated to the mathematical formula to be used to calculate fair market value. Since there is no such stipulation of the parties in this case, *Saunders* does not apply.

Taxpayer relies upon the written appraisal of W.E. Bishop, a realtor, appraiser and consultant from Lake City, Florida, in which Mr. Bishop, using a 22% rate of return for capitalizing the future lease payments, concludes that the present value of the future lease payments is $129,665.31

and the reversionary value of the timberland at the end of the lease (present cash value) is $285.94, a total of $129,951.25. (Joint Exhibit 4). Mr. Bishop, due to illness, did not testify.

Taxpayer further relies upon the written apppraisal (Joint Exhibit 5) and testimony of William R. Sizemore, a practicing appraiser and forester from Tallassee, Alabama, whose qualifications are set forth in Plaintiff's Exhibit 3. Mr. Sizemore is of the opinion that because of the lessee's right of first refusal, no investor other than the lessee would evaluate and bid upon the property. Further, Mr. Sizemore stated:

"It is my opinion that Owens–Illinois itself would have been the most probable buyer of the interests of the lessor in the Russell Carter estate property as of 1981. Owens–Illinois is not only the most probable purchaser but is likely to be the only potential purchaser. For this reason, the appraisal process must focus on the amount that Owens–Illinois would pay for the lessor's interest. Inasmuch as the rate of increase in timber values has been significantly more than the increase in the Producer Price Index, Owens–Illinois had in 1981, and continues to have, a positive leasehold interest. Thus Owens–Illinois, as the possessor of a very favorable lease 41 years away from expiration, itself would have required a rate of return equal to or more than the rate that could be obtained from the purchase of similar unencumbered timberlands in the general area.

"The first step, then, is to identify the rate of return that would be expected by Owens–Illinois. If Owens–Illinois (or any other prospective purchaser) were interested in buying the lessor's interest on February 12, 1981, it would have considered the prime rate at that time as one indicator of the appropriate capitalization rate it should use to value the property. At the date of valuation, the *Wall Street Journal* quoted the prime rate as approximately 19.25 percent. Discounting the income stream for 40 payments (beginning of the year) and a $300 reversion at the end of 41 years, at

19.25 percent produces a value of $47.56 per acre ($157,376 in total).

"Under the lease agreement, Owens–Illinois has virtually unlimited use of the Carter property for the 41 years after Russell Carter's death. Thus, if it purchased the lessor's interest in the property, it would merely avoid the obligation to make its rental payments over the remaining term of the lease and gain the right to keep the property rather than have it revert to the landowner at the end of the lease term. Thus, Owens–Illinois would have based its purchase price decision on the present worth of its avoided costs during the remainder of the lease term plus the present worth of the reversion less any additional costs incurred to purchase the lessor's interest. Since the lease payment is an ordinary expense, the amount per acre avoided annually is only 54 percent of $9.12 or $4.92 per acre disregarding state taxes. Use of the after tax cost of the lease payments is appropriate because payment for the land would have to be permanently capitalized for both book and tax purposes.

"Owens–Illinois has confirmed that during its history of operations in the South Georgia–North Florida area, it has purchased only three tracts of property subject to a long term timber lease. In each of the purchases, the lease contained a purchase option exercisable by Owens–Illinois at a fixed price specified in the lease at any time before a date certain. In each case, the company exercised its option at the time it did *and at the price specified in the lease,* because its cash flow analysis in combination with certain special and general benefits of obtaining fee title showed that this would be a desirable course of action. Details of the 3 leases and their conversions are as follows:

L.L. Parish Lease

| Purchase Price | Lease Payment | Acres |
|---|---|---|
| $17,120.00 | $6.45/Acre | 428 |
| $40 per Acre | $3.48/Acre after tax | |

Remaining Term—August 28, 1981—August 19, 2023 (41 lease payments; 42 years to reversion)
Total lease payment—$2,760.60; next payment August 20, 1982
After tax—$1,489.44

Calculated after tax IRR on avoided cost—9.86%

### B.L. West Lease

| Purchase Price | Lease Payment | Acres |
|---|---|---|
| $218,823.60 | $2.00/Acre | 5,470.37 |
| $40 per Acre | $1.08/Acre after tax | |

Remaining Term—November 9, 1979—July 14, 2020 (40 years, 8 months)
Total lease payment—$10,940.74; next payment July 15, 1980
After tax—$5,908.00
Calculated after tax IRR on avoided cost—6.26%

### C.L. Brice Lease

| Purchase Price | Lease Payment | Acres |
|---|---|---|
| $29,961.20 | $2.00/Acre | 1,498.06 |
| $20 per Acre | $1.08/Acre after tax | |

Remaining Term—December 22, 1978—July 14, 2020 (41 years, 7 months)
Total lease payment—$2,996.12; next payment July 15, 1979
After tax—$1,617.90
Calculated after tax IRR on avoided cost—8.95%

*"These per acre conversion payments were fixed at the beginning of the lease terms and hence are suspect* as absolute per acre value. However, they can be used to derive indications of the rate of return that would motivate Owens–Illinois to convert one of its leases to fee ownership. Using each of the rates of return, an after tax payment of $4.92 per acre per year with 40 remaining payments, and a $300 per acre reversion at the end of 41 years indicates that present values to Owens–Illinois of the Carter property would be as follows:

| Lease | Date of Conversion | After Tax IRR |
|---|---|---|
| L.L. Parish | August 28, 1981 | 9.86 |
| B.L. West | November 9, 1979 | 6.26 |
| C.L. Brice | December 22, 1978 | 8.95 |

Present Worth of:

| | 40 After Tax Rental Payments | Reversion of $300 | Total |
|---|---|---|---|
| [Parish] | $48.74 | $ 6.35 | $55.09 |
| [West] | $71.67 | $24.89 | $96.56 |
| [Brice] | $53.19 | $ 8.93 | $62.12 |

"The indicated values do not take into account any additional costs that Owens–Illinois would have incurred to purchase the property. If, in fact, the company had been required to borrow the purchase amount and pay a market interest rate, the calculated values overestimate the present value to Owens–Illinois of purchasing the lessor's interest in the land in 1981.

"I have reviewed the IRS Valuation Engineer's appraisal of the Carter property and have considered the validity of his 'real' rate of return analysis. While it is unsettled whether this approach has any theoretical economic basis, in my experience, both in valuing timberland myself and in dealing with numerous other appraisers, it is not an approach that would be relied on by an investor considering the purchase of the Carter property, and, thus, it does not accurately indicate the price at which the property would change hands 'between a willing buyer and a willing seller.'

"My view on real rates is supported by an article in the *Wall Street Journal* of December 15, 1983, by Paul Fabra, economics columnist for *Le Monde,* a Paris newspaper. Points made by Mr. Fabra which are especially pertinent to the appropriate discount rate for the Carter property are as follows:

… Are American interest rates bound to fall, or to rise? … The discussion has been confused by the widespread acceptance of the misleading concept of 'real interest rates.' It would not only be simpler but logically sounder to consider that the only real interest rate is the rate really charged in the marketplace. Prices (including the so-called price of money) are untimately determined by objective factors, not such subjective perceptions of reality as, for example, 'inflationary expectations,' even if we cannot rule out the possibility of short-lived booms or panicscreated by psychological factors … my contention is that the concept [of 'real interest' rates] is fraught with so many flaws that it ultimately should be rejected. To begin with, there is a strong methodological objection to it. 'Real interest' rates are supposed to be equal to any chosen nominal interest rate minus the so-called rate

of inflation (minus the expected rate of inflation, some would argue, which makes the concept still more exclusive). So you are matching two kinds of figures that are of very different natures. Nominal rates are data, while price indexes that are supposed to measure inflation are statistical constructs, a mere representation of reality. Therefore, to deduct an index from an interest rate is not a coherent operation

.    .    .    .    .

Mr. Fabra could have added that even the so-called 'real interest rate' is never known until after the fact. Thus, an appraiser using such a derived rate is making use of information that could not have been available to buyers and sellers in the marketplace.

"Even if the Engineer's approach were valid, he had grossly underestimated the 'real' rate of return demanded by the market in 1981. While it is impossible to accurately fix the 'real' rate of return demanded by investors, one indication of the rate that might be expected at or about the valuation date is the difference between the prime rate and the rate of inflation during that period of time. As already pointed out, the approximate prime rate at that time was 19.25 percent. The inflation rate at that time as measured by the 4th quarter 1980 change in the Producer Price Index was 9.03 percent. Using the Engineer's formula to separate inflation from the market interest rate produces a 'real' rate of 10.22 percent. Although this is higher than the Engineer's assumed real rate of 2.68 percent, its reasonableness is demonstrated by the current prime rate of approximately 11 percent at a time when there is virtually no inflation.

"The lease buy-out nearest to the date of Mr. Carter's death was the Parish purchase of August 18, 1981, which produced a rate of return on avoided costs of 9.86 percent. This rate from this transaction produces a value estimate of $55.09 per acre or $182,-318.15, which, in my opinion, is the maximum value for Mr. Carter's interest in the lands under lease to Owens–Illinois at the time of his death."
(emphasis added).

The government's expert, Dr. Harry Haney, a consulting forester and Associate Professor and Extension Specialist, Management–Economics, Department of Forestry, Virginia Polytechnic Institute and State University (Defendant's Exhibit 2), submitted a written valuation report (Joint Exhibit 7) and also testified.

Dr. Haney used the same mathematical formulas utilized by taxpayer's appraiser, Mr. Bishop, but arrived at a substantially lower discount rate and a corresponding higher value which he explained in his report as follows:

"B.  Discount Rate

"The observed nominal pretax rate of return on any asset can be explained by four factors: the real rate of return, expected inflation, liquidity and risk (Weston and Copeland, 1986, p. 158). An estimate of the average safe historical rate of return on capital was obtained by deflating the rate of interest of 10 year U.S. Treasury bonds, Moody's Aaa corporate bonds and the prime rate charged by banks for the contract period to the date for valuation (1956–1980). The averages were 1.57 percent, 2.03 percent and 2.27 percent for Treasury bonds, Moody's Aaa bonds and the prime rate, respectively (Table 1). These rates are generally assumed to be relatively risk free. A similar result was reported by Worley and Giardano (1974) in their paper reviewing inflation and interest rates. They concluded that over the last 15 years (1969–1974), the real rate of return on commercial paper had averaged around 2 percent.

"The Carter contract is also relatively risk free insofar as the risk of default on the annual payments is concerned. The contract which was owned by Owens–Illinois at the date of valuation was written in terms very favorable to the lessee.

*    *    *

"While the Carter lease is judged to be relatively risk free from the standpoint of lessee performance on annual payments

and therefore, comparable to the returns estimated for historical yields on Government securities in real terms, the contract is highly illiquid. Generally, investors will accept lower returns on short term instruments, other factors being equal, because the long term future is inherently uncertain (Weston and Copeland, 1986, p. 149). The premium for illiquidity is suggested by the differentials between short term (one year or less) and long term Treasury securities shown in Table 3. A simple average of the differential between 3 month and 10 year U.S. Securities was 0.86 percent. The difference between 6 months and 10 year U.S. Securities was 0.71 percent. The illiquidity premium generally ranges between one and two percent (Wall Street Journal, various). Because of the 40 year term of the Carter contract, the higher estimate seems more appropriate. Investments in forest land are inherently low risk because land and timber are real property, timber prices generally increase at rates above inflation (U.S. Forest Service 1987) and business loans have an interest tax shield (Fortson 198x). Finally, the rate of interest for valuing the Carter lease based on a real rate (i.e., free of inflation; Table 1), adjustments for illiquidity (Table 3) and adjustments for risk is estimated to be in the range of 4.0 to 4.25 percent.

C. Valuing the Lease Payments

"Valuation of the Carter contract's stream of 40 annual payment is calculated with formula (2). It gives the present value of an annuity, defined as a series of payments of a fixed amount for a specified number of years (Weston and Copeland 1986, p. 76). This formula correctly estimates the present value of the annual payments, if the payments are held constant and a real discount rate is used. The annual payments are held constant by not adjusting for the inflation measured by the PPI. Instead, the inflation is taken out of the discount rate to keep the elements of the formula in the same context. Thus, the cash flows for 40 years are in real terms, net of inflation, and the discount rate is in real terms, net of inflation. The present value of annual payments for the three interest rates estimated above (Table 1) are shown in Table 2.

D. Valuing the Revisionary Interest

"The revisionary interest of $300 per acre was accepted by all experts who expressed an opinion as to its value. They were Mr. Bishop, Dr. Sizemore, and Mr. Elmore. Since there is agreement on this point, I have accepted the $300 per acre value, and I have assumed that it is expressed in 1981 dollars (i.e., not adjusted for inflation). At the termination of the contract the property will still have the potential to grow timber and for selling the hunting rights. Because the contractual language favors the lessee regarding the condition in which the land will be left, this creates considerable uncertainty as to the value of the timber left in year 2020. Larry Glorius stated that Nekoosa would honor the terms of the contract regarding minimum volumes of timber at the termination of the agreement. He also noted that the reversion date was too far into the future to be more specific than that. He added that Nekoosa had several options for satisfying the 'good forestry' provisions of the contract with regard to reforestation of stands harvested near the end of the contract. He noted however, that they had considerable latitude in how the good forestry contractual provisions might be interpreted. Depending on how the land is reforsted and the timing of the final harvests before revision, the revisionary values for forestry (in 1981 dollars) could range from under $200 to over $400 per acre.

"The property has potential for alternative land uses due to considerable frontage on a major highway (U.S. 441) and it borders on the historically famous Suwannee River. The zone along the River requires specialized management and is subject to additional future regulation by the Suwannee Water Management District. Thus, the property will have a number of potentially attractive land uses by the year 2022, but there are also some restrictions that may be imposed due to the special nature of the property. While $300 per acre may be a conservative estimate, the uncertainty

inherent in these future events warrants accepting this value.

"The present value is calculated using formula (1). The future value $V_n$ is expressed in 1981 dollars (without inflation) and the discount rates are the same ones estimated previously in Table 1. The results are shown in Table 2.

* * *

## VI. Summary:

"The principal valuation of the Carter estate is based on the 1981 price level for cash flows, revisionary value and hunting lease potential. Because current interest rates and inflationary expectations often vary sharply in the short run as illustrated in Attachments G and H of the case documents, real rate of interest were estimated based on long run trends for several relatively risk free instruments (Table 1). These were adjusted for illiquidity (Table 3) and risk. Results are shown for three estimates of present value in Table 2. For comparison the results were recalculated in current terms using cash flows with inflationary adjustments from the 1980–1981 PPI which were assumed to continue. Discount rates from the Bishop and Sizemore reports were used to estimate present values (Table 4). The results are roughly comparable with differences due primarily to assumptions about adjustments in interest rates for risk and uncertainty. Finally, the income approach was cross referenced with Elmore's market data results. Although four samples is too small to produce precise estimates, the case most nearly like the Carter lease gave results that were quite close to results with the income method. Therefore, based on an independent valuation of the Carter estate assets and compared with the work of Bishop, Dr. Sizemore and Elmore, I conclude that the value of the Carter estate should be not less than $248.83 per acre, or $823,498 total."

Of Dr. Haney's $823,498.00 total value, $62,952.00 is his opinion of the value of wildlife or hunting. The court having found that the personal hunting rights have no monetary value, that amount upon trial was eliminated, leaving a total value of $760,546.00.

Dr. Haney's Table 2 revised to eliminate Wildlife Value shows:

Table 2. Present Value of Carter Estate for Average Real Rates of Return from Treasury Bonds, Moody's Aaa Bonds and the Prime Rate. Adjusted for Illiquidity and Risk.*

|  | 10 year Treasury Bonds | Moody's Aaa Bonds | Prime Rate |
|---|---|---|---|
|  | ($) | ($) | ($) |
| Ann. Payments | 637,604 | 594,733 | 574,121 |
| Term. Rev. Int. | 244,072 | 204,425 | 186,425 |
| ~~Wildlife Value~~ ** | ~~69,913~~ | ~~65,212~~ | ~~62,952~~ |
| Total Value | ~~951,589~~ | ~~864,370~~ | ~~823,498~~ |
|  | 881,676 | 799,158 | 760,546 |
| Value Per Acre | ~~287~~ | ~~261~~ | ~~249~~ |
|  | 266 | 241 | 230 |

* Illiquidity and risk estimated to be 2 percent.
**Assuming $1 per acre per year.

The difficulty with the taxpayer's contentions of ultimate findings of fact is that as a matter of common sense any willing buyer, including Owens–Illinois or Nekoosa, would pay $182,318.15 for an inflation-free return of $30,182.00 per year—16.5 percent per annum rate of return—and the ultimate ownership of 3,309.46 acres of land forty years in the future. A willing buyer, of course, would be a person able to pay $182,318.15. Having the right of refusal it has, Owens–Illinois or Nekoosa would not sit by and permit someone else to acquire this property for just six annual lease payments. The cash flow chart submitted by taxpayer's expert at the court's request confirms this court's factual conclusion that any willing buyer would jump at the opportunity to pay $182,318.15 for this leased property. But would any willing seller accept $182,318.15 for this leased property, thereby giving up an inflation-free return of $30,182.00 per year? Given $182,318.15 in cash, could a willing seller find a safe, illiquid investment paying 16.5 percent per annum? Nothing submitted by any expert—taxpayer's or government's—suggests that a willing seller could possibly expect to do so. A willing seller would therefore not even think of selling this leased property for $182,318.15.

The same difficulty exists with the government's contention that the fair mar-

ket value of this leased property is $760,546.00. Any willing seller would accept $760,546.00 for this leased property, thereby exchanging an illiquid investment producing $30,182.00 per year for cash which invested at just five percent per annum would produce $38,027.00 per year—almost $8,000.00 more than was being received at Mr. Carter's death; BUT no willing buyer would pay $760,546.00 for this illiquid leased property since other liquid investments would produce an equal and most likely greater return. Those rates of return are well documented in the reports of the government's expert and are therefore not enumerated. A five percent insured savings account or certificate of deposit, which is and for as long as this judge can remember has been commonly available, would produce—as already calculated—$38,027.00 per year, a return which would deter a willing buyer from removing his money from savings accounts or certificates of deposit and purchasing this property for $760,546.00.

Having rejected the taxpayer's and the government's contentions of ultimate fact, the court is left without other contentions to consider and with the responsibility to arrive at the fair market value of this leased property using the same resource that jurors use—COMMON SENSE—and realizing that the issue is totally hypothetical in that the court must assume a willing buyer and a willing seller when under the facts neither can really exist.

In the court's considered judgment a willing buyer would have been willing to pay an amount of money for the $30,182.00 stream of income that would cause that income to equal a ten percent return on his investment—$301,820.00—and for the ownership of the 3,309.46 acres of land forty years hence would have been willing to pay an additional $140,983.00—arrived at by calculating the present worth of 3,309.46 acres at $300.00 per acre using a five percent discount rate [3]—for a total fair market value of $442,803.00. A willing seller de-

sirous of selling this illiquid investment would gladly accept that amount and invest the same in some safe, liquid investment, sacrificing some income for the greater benefit of liquidity.

Accordingly, this court does hereby find that the fair market value of the subject leased land owned by Russell L. Carter on the date of his death was $442,803.00.

The parties are invited to prepare and present an agreed upon form of judgment within fifteen days.

SO ORDERED.

---

**3.** See O.C.G.A. 51–12–13 which, while not controlling, provides:

It shall be lawful for the trier of fact, in determining the present value of any future earnings, annuity, or amounts, to reduce the same to the present value upon the basis of interest calculated at 5 percent per annum. (Ga.L.1970, p. 168, § 2).